

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-20-00009-CV

———————————————

REX PERFORMANCE PRODUCTS, LLC, Appellant

V.

JAMES DONALD TATE AND MICHAEL CUFFIA, Appellees

---

On Appeal from the 141st District Court
Tarrant County, Texas
Trial Court No. 141-314043-19

---

Before Sudderth, C.J.; Womack and Wallach, JJ.
Memorandum Opinion by Justice Womack

## MEMORANDUM OPINION

### I. INTRODUCTION

Appellant Rex Performance Products, LLC (RPP) sued Appellees James Donald Tate (RPP's president and chief executive officer) and Michael Cuffia (RPP's director of operations) and alleged that (1) Tate negotiated the sale of RPP's assets to another company, (2) unknown to RPP, Tate negotiated a separate retention bonus (or "super bonus") agreement benefitting Tate and Cuffia at the expense of RPP's sales price, and (3) Tate deliberately downloaded a virus onto his RPP computer to destroy evidence of his reducing RPP's sales price in a tradeoff for his and Cuffia's "super bonus." After the trial court granted Tate and Cuffia's traditional and no-evidence motion for summary judgment and dismissed RPP's claims, RPP brought this appeal. We affirm the portion of the summary judgment dismissing the claim that Tate breached his common law fiduciary duty by downloading a virus on RPP's computer. We reverse the remaining portions and remand those matters for trial.

### II. BACKGROUND

**A. The Parties**

RPP is a Michigan limited liability company that manufacturers polyethylene foam, the material used to protect goods during shipping. Pregis Performance Products[1] (Pregis) is a provider of protective packaging materials and systems

---

[1]Pregis Performance Products LLC was newly created just before the transaction closed. Pregis LLC was the entity which negotiated the asset sale.

headquartered in Chicago that operates multiple North American manufacturing and warehousing facilities devoted to protective packaging solutions. On February 23, 2018, RPP completed its asset sale to Pregis. At the time of the asset sale, RPP's equity was held as follows:

- Williamette Holdings, LLC, a Nebraska limited liability company—63.12%

- Tate, RPP's President and Chief Executive Officer—21.33%

- Cuffia, RPP's Director of Operations—9.55%

- Jeff Smith, RPP's Director of Engineering—5%

- Emerald Peak Group, LLC, a South Dakota limited liability company—1%.

Williamette is owned equally by John Ballinger, Rob Story, and Rex Hansen, and each of the Williamette members personally guaranteed the debts of RPP and personally funded financing to RPP.[2] Emerald Peak is owned equally by Rex Hansen and Heidi Hansen. Hansen[3] also owns and controls an entity by the name of Maxwell Morgan, LLC, which had lent significant amounts of money to RPP. While neither Hansen, Ballinger, nor Story ever received a salary from RPP, both Tate and Cuffia received salaries while employed by RPP.

---

[2]According to Hansen, neither Tate nor Cuffia ever signed a personal guaranty of any of the debts of RPP.

[3]All references to "Hansen" in this opinion refer to Rex Hansen rather than Heidi Hansen.

## B. The Asset Sale Negotiations

According to Hansen, discussion of the asset sale began in November 2016 when Manu Bettegowda, a member of the Pregis board of directors, approached RPP regarding the possibility of purchasing all of RPP's assets. A formal letter of intent was submitted around January 5, 2017. Negotiations on behalf of RPP were led by Hansen before the letter of intent and by Tate thereafter.

In Hansen's opinion, the proposed price to purchase all of RPP's assets was $24 million before the parties terminated discussions in February 2017. Bettegowda also testified in his deposition that the first round of negotiations involved a letter of intent at $24 million, but that deal fell apart.

As early as October 21, 2017, Tate was communicating to Cuffia to "[t]hink about creative ways to craft this deal so that M[axwell] M[organ] doesn't derail it and the added values go to the RPP team." Negotiations started again in December 2017 when, according to Hansen, Pregis contacted Tate, who was entrusted with the responsibility of negotiating the sale on behalf of RPP and was authorized to sell RPP's assets to Pregis for $20 million.[4]

---

[4]In his deposition, Hansen admitted that he "had no direct communication from Pregis [that] they would pay [$20 million]." Hansen also testified that he had no direct communication with anybody who told him that they would pay $20 million for RPP in this time period and that there was no valuation analysis completed by a third party that indicated that the company was worth $20 million.

By January 15, 2018, it was clear that Tate was unhappy with the deal. On that date, Tate emailed Hansen:

> I look at [the deal] and say, hmmm are the ownership percentages [in RPP] representative of the time, effort, sacrifices and commitment put forth by such individuals? Easy for me to rank accordingly, but I'd rank #1 D Tate #1A R Hansen #3 M Cuffia #4 Jeff Smith #5 J Ballinger #6 Rob . . . . I'm very dissatisfied with less than $2 million; rather pitiful showing for all the commitment, effort, time and sacrifices.

Hansen responded, "Unfortunately this has not ended in the pop we all wanted. . . . Let's drag it across the line, and fin[d] the next deal that costs less and makes us more!"

After Tate met with Pregis personnel on January 15, 2018, Hansen contends that Tate advised the RPP members that Pregis would offer no more than $18 million for the RPP assets. Hansen says that "[s]hortly thereafter, Tate lowered the price again, and advised the other RPP members that Pregis was only willing to pay $17 million." [5]

After consultation, the RPP members agreed to the purchase price because, in Hansen's words, "Tate was adamant that $17 million was the best price RPP was going to receive and pressured the other RPP members to accept the offer." One day later, Tate texted Bettegowda, "In case Rex calls you randomly I've communicated to him 2 days ago you've offered $16.5-17 with $17 as max."

---

[5]Bettegowda later testified at his deposition that Tate did not suggest reducing the purchase price from over $18 million to $17 million.

## C. The "Super Bonus"

Much of the dispute in this case centers around what the parties have referred to as a "super bonus." In his deposition, Tate testified that the idea for the "super bonus" originated with Bettegowda. In a January 18, 2018 email to Cuffia, Tate discussed the

> compensatory plan payable to the RPP Executive Team: The Purchase Price of $17[ ]million would be paid to Rex Ownership and a separate and additional bucket of $1.5 million would be set aside and payable as a "super bonus" to the Executive Team for their commitment to the Pregis Team.

The "super bonus" would be paid separately from any salary/bonus package and paid in three installments over a one-year period.

Bettegowda confirmed the deal in an internal January 18, 2018 email: "We have agreement on Rex. 17 mln pp at close. 750 in six months to management and another 750 k at 12 months. Please keep the retention payments confidential as this will not be in the contract."

On the same day, Tate sent an email to Bettegowda "intended to summarize our last phone call regarding our discussion[.] Our last conversation confirmed your purchase price offer as a cash asset purchase price of $17 million, plus inventory with a quick close; approximately 2/15/2018." The email included details about himself—described as the "Executive Team Leader: Don Tate"—as well as his statement, "I'm happy to cash in my equity position and super bonus from RPP and take an opportunity outside the Packaging World if that better serves you and the Pregis

Team." The email concluded with Tate's promise, "My commitment is, as yours, to stay engaged as the primary RPP contact to assure we don't get derailed; we'll not allow Rex/John nor Kevin/Keith, nor anyone else from either side to derail the project."

On January 19, 2018, Tate sent another email to Bettegowda setting out the terms of the agreement:

> Those of us who are equity owners get the money up front from the sale and felt that some part of the super bonus should also be paid up front to offset the lower price for the business. Rex has been adamant a[b]ou[t] getting $20 million for the business, but us equity owners have persuaded him to consider $18 and then we put a bit more pressure on him for the $17 with knowledge that there would be employment bonuses for those staying with the sale.

Two days later, Tate sent Cuffia an email noting, "If they'll agree with 30% superbonus up front, it's a lil more than the difference between $17 and $18." Tate then confirmed with Bettegowda on the same day that the purchase offer was for "$17 million plus inventory," with a "super bonus" program that is "separate and independent of this purchase agreement and will remain totally confidential and separated from the LOI [letter of intent], APA [asset purchase agreement] and/or any of the other purchase sell documents."

On January 22, 2018, Bettegowda emailed Kevin Baudhuin, Pregis's president and CEO, saying,

> I don't think they are leaving at close. The reason the 1.5 mln isn't mentioned anywhere is that he doesn't want Rex to know about it as they are getting nothing on the 17. The price was 18 and change and he

7

suggested moving it to 17 and using a million to pay the team and to keep them on board.

Baudhuin responded,

> Feels like with this being separate they could get the[ir] $17mm and leave[.] [D]o you agree? Without them staying on board I lose a bit of interest at the price and the current profit level.
>
> Additionally, to incentivize the Executive and Local Team, a Super Bonus program has been offered and will be separate and independent of this purchase agreement and will remain totally confidential and separated from the LOI, APA and/or any of the other purchase sell documents.

Hansen contends that there was never an offer presented to him for anything greater than $17 million. In his words, "Instead of discussing a potential $18.5 million that was available for the sales price, Tate wove a tale of woe, advising the RPP team that they should count their blessings that Pregis was willing to offer $17 million."

## D. RPP's Discovery of the "Super Bonus"

According to Hansen, he first learned of the "super bonus" after the weekend of January 20–21, 2018, when he "met with the RPP executive team to discuss Tate's suggestion that we fire one of RPP's employees, John McMillan, for cause. To support that potential termination, Tate agreed to allow RPP's IT specialist to search his emails for communications concerning McMillan." Hansen, Ballinger, and another person then conducted a review of emails on January 24, 2018, "in order to

collect information RPP might need following the transaction with Pregis."[6]   In

Hansen's words,

> The reviews resulted in the startling discovery that Tate had negotiated a secret deal with Pregis, through Bettegowda, whereby Tate and others would receive a "Super Bonus" of $1.5 million (separate and apart from job-related compensation) in exchange for driving the sales price of RPP's assets down from $20 million to $17 million.

In addition to the earlier emails, Hansen says that he discovered a January 23, 2018 email from Tate to Bettegowda which included the following charts that, in Tate's words, showed a "summary of the ownership payout and [his] thinking around the retention bonus payments."[7]

| | Purchase Price | N Cash Proceeds | | | $ 18,500,000 | $18 vs $17 |
|---|---|---|---|---|---|---|
| | $17,000,000 | $ 3,839,621 | | | $ 5,339,621 | $ (1,500,000) |
| Willamette Holdings | 63.12% | $ 2,423,569 | $ 807,856 | 33.33% | $ 3,370,369 | $ (946,800) |
| Emerald Peak | 1.00% | $ 38,396 | | | $ 53,396 | $ (15,000) |
| James Tate | 21.33% | $ 818,991 | | | $ 1,138,941 | $ (319,950) |
| Michael Cuffia | 9.55% | $ 366,684 | | | $ 509,934 | $ (143,250) |
| Jeff Smith | 5.00% | $ 191,981 | | | $ 266,981 | $ (75,000) |

---

[6]Hansen testified in his deposition that Tate authorized the email review because Tate felt that RPP "could fire John McMillan for cause, because he was not living up to the expectations he set for himself."

[7]Jeff Smith is RPP's Director of Engineering who was to receive a 2% equity position in RPP profits as of June 1, 2016.   In addition, he was to receive an additional 1% equity position in RPP each year from December 31, 2016, through December 31, 2018.   Smith and Nilesh Amrutiya, a process engineer, are described as "management employees of RPP" in "Defendants' Traditional and No-Evidence Motion for Summary Judgment."

| | Hire Date | $1,500,000 old % | new % | adj % Nilesh | | Retention Pay | 33% 3 equal payments |
|---|---|---|---|---|---|---|---|
| | | | | | | | |
| James Tate | 1/1/2012 | 21.330% | 59.43157% | *$1.4mm | | $ 832,042 | $ 277,347.22 |
| Michael Cuffia | 2/17/2013 | 9.560% | 26.63693% | *$1.4mm | | $ 372,917 | $ 124,305.68 |
| Jeff Smith | 6/1/2015 | 5.000% | 13.93145% | *$1.4mm | | $ 195,041 | $ 65,013.77 |
| Nilesh A | 3/1/2012 | 0 | | | | $ 100,000 | $ 33,333.33 |
| | | | | | | $ 1,500,000 | $ 500,000.00 |
| | | 35.890% | 100.00% | | | | |
| | | x | 2.78629 | | | | |

*Team Retention Bonus Payout Summary*

After discovering the emails, Hansen did not contact Tate to ask him about the "super bonus." Rather, Hansen believed that "our best option was going forward with the sale." At his deposition, Hansen explained his thought process:

> [O]ur discussions were really we were concentrating on what were our options, what could we do right now. And one of the options was, hey, call Manu [Bettegowda], confront him on this. Call D[o]n Tate, confront him on this. The other option was to, hey, let's figure out what our rights would be if we close the deal.
>
> The one thing that we felt absolutely was that Don Tate would, if we confronted Don Tate, he would walk out the door, and our backup plan for management in case something happened to Don Tate was always Michael Cuffia. But it became pretty apparent Michael Cuffia was complicit in the super bonus arrangement, so we felt we didn't have a good management backup program. And the company, while finally hitting some sales targets, was losing money really fast.
>
> So our ultimate analysis was we have to close this deal as it is and maintain our rights as best we can to get any fairness out of this when it is all over.

## E. Letter of Intent and Continued Negotiations

A letter of intent, which was signed by Bettegowda on behalf of Pregis and by Hansen on behalf of RPP, was entered into on January 29, 2018. In addition to other

agreements, it set out the $17 million purchase price but did not reference the retention bonus agreements.

Tate said that he, Story, and Ballinger (the Williamette members) continued to discuss their options from January 24 up until February 23. Ballinger was worried about what Pregis would do: "In a negotiation, each side keeps its cards close to the vest. In our negotiation, none of our cards were close to the vest because our negotiator was sharing the data, our side data with the other side, so that caused us a huge problem."

Despite the knowledge of the "super bonus," Hansen continued to push for the sale. After receiving a February 7, 2018 email from Tate saying that he was "trying as hard as [he could] to get this deal with Pregis across the finish line but [was] struggling big time to commit to staying and working for them," Hansen's response was, "You can do it!!"

On February 13, 2018, Bettegowda sent Tate the retention bonus agreement. Two days later, the email containing the retention bonus agreement was obtained and forwarded to Hansen. However, according to Hansen, he did not receive an executed copy of the retention bonus agreement until after this lawsuit was filed.

In his deposition, Bettegowda testified that Pregis would not have "done the deal" without the management team. There were two separate components associated with the purchase price of $17 million—one was the purchase of the assets, and the second was a series of retention bonus agreements. In this "second" round

11

of negotiations with RPP, Bettegowda stated that Pregis never agreed to pay more than $17 million and that Tate did not suggest reducing the purchase price from over $18 million to $17 million.

## F.  Request for Releases

As the deal approached closing, Tate sought to get releases before signing the agreement.  According to Hansen, "Over the course of February 22, 2018, until the deal was closed on February 23, 2018, Tate, either himself or through his lawyer, made 13 demands for full releases before Tate would sign the APA."  Despite the demands, Hansen said that "[e]ach of Tate and Cuffia's demands for releases of liability were explicitly and unequivocally refused."

RPP's counsel in the underlying transactions, Stephen Gross, testified at his deposition that Tate told him the following about why he wanted a release:

> [W]hat Don Tate told me was I don't want to be held responsible for things I didn't know about.  I was not in control of the cash, there could have been financial irregularities, et cetera.  Which is why my thought in a way to bridge the gap was to give Don what he wanted, which is the discretion of a limited release. . . .

However, according to Gross, when Tate was given a limited release, "he didn't want it, he wanted a complete release.  Which is why I surmised that his real issue was the potential claims that you guys are now having fun with."  Gross's "interpretation was [Tate] wanted a release because he was aware of the actions that are the subject matter of this complaint and he was trying to use his signature as leverage to get that."

12

As Hansen noted in his declaration, without Tate's and Cuffia's signatures, the entire sale was at an impasse: "It is important to recall that Tate and Cuffia are both equity owners of RPP and officers and employees of RPP. As equity owners, the sale of the assets of RPP to Pregis could not consummate without the signatures of Tate and Cuffia." Hansen asserted that Tate and Cuffia attempted to barter their signatures for full releases: "Tate and Cuffia decided to exploit this fact when, on February 22–23, 2018, they . . . attempted to withhold their signatures on the APA in exchange for full releases from any and all acts."

## G. Computer Virus and Closing

"Then," recounted Hansen, "conveniently, on February 21, 201[8], the day before Tate attempted to hold the entire transaction hostage for a full release from RPP, a virus infected Tate's computer and attac[k]ed his email. No one else's emails were attacked by the []virus."

Even though "[e]ach of Tate and Cuffia's demands for releases of liability were explicitly and unequivocally refused," the closing went forward on February 23, 2018. When the closing took place, Hansen was "aware that a super bonus may be paid or may not be paid." However, he thought it would occur.

According to Bettegowda, there were four people—two of whom were Tate and Cuffia—who received retention bonus agreements from Pregis. Tate and Cuffia went to work for Pregis and earned the bonuses in installments over time. In

13

Hansen's words, "Tate received a bonus four times the size of his annual salary for betraying RPP."

## H. Litigation

The closing occurred on Friday, February 23, and two lawsuits—one in Texas and one in Michigan—were filed on Monday, February 26. In this suit, RPP originally sued Tate, Bettegowda, Pregis, and Olympus Partners, LP.[8] The trial court granted the special appearance filed by Pregis and Bettegowda, which we affirmed. *Rex Performance Products, LLC v. Bettegowda*, No. 02-18-00171-CV, 2019 WL 3955205 (Tex. App.—Fort Worth Aug. 22, 2019, no pet.) (mem. op.). Later, Cuffia was added to the lawsuit.

In its pleadings, RPP alleged (1) breach of common law fiduciary duty against Tate and Cuffia on several grounds, (2) breach of common law fiduciary duty against Tate for destroying RPP electronic information by allegedly downloading a virus on his computer, (3) liability of all defendants as joint tortfeasors based on the "super bonus" agreement, and (4) conspiracy against all defendants for "driv[ing] down the purchase price for the assets of RPP in exchange for additional secret compensation to Tate[ and] Cuffia." Tate and Cuffia filed a general denial and asserted numerous affirmative defenses, including waiver and ratification.

---

[8]In its pleadings, RPP stated that Olympus Partners, LP, a private equity firm, acquired Pregis in May 2014. Hansen asserted in his declaration that Olympus Partners, LP owned Pregis at all times relevant to this dispute.

After discovery, Tate and Cuffia filed their traditional and no-evidence motion for summary judgment. In their motion for summary judgment, Tate and Cuffia sought summary judgment because: (1) RPP knew of the retention bonuses before the sale; (2) RPP waived or ratified any alleged breach; (3) there is no evidence of damages, or RPP's damages are waived or ratified; and (4) there is no evidence Tate downloaded a virus onto his computer, or there is evidence that the virus was due to a ransomware demand. RPP responded to the motion.

After a hearing, the motion for summary judgment was granted, and the claims against Tate and Cuffia were severed. This appeal followed.

## III. DISCUSSION

### A. Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

When a party moves for both traditional and no-evidence summary judgments, we first consider the no-evidence motion. *First United Pentecostal Church of Beaumont v.*

15

*Parker*, 514 S.W.3d 214, 219 (Tex. 2017). If the non-movant fails to meet its burden under the no-evidence motion, there is no need to address the challenge to the traditional motion as it necessarily fails. *Id.*

A party may move for a no-evidence summary judgment "on the ground that there is no evidence of one or more essential elements of a claim or defense on which an adverse party would have the burden of proof at trial." Tex. R. Civ. P. 166a(i). The court must grant the motion unless the respondent produces summary judgment evidence raising a genuine issue of material fact. *Id.* The nonmovant may raise a genuine issue of material fact by producing "more than a scintilla of evidence establishing the existence of the challenged element." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004).

To obtain a traditional summary judgment, a movant must produce evidence showing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 551 (Tex. 2019); *see* Tex. R. Civ. P. 166a(c). A defendant that conclusively negates at least one essential element of a plaintiff's cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508 (Tex. 2010); *see* Tex. R. Civ. P. 166a(b), (c). A defendant is entitled to summary judgment on an affirmative defense if the defendant presents summary judgment evidence that conclusively establishes each element of the affirmative defense. *See Chau v. Riddle*, 254 S.W.3d 453, 455 (Tex. 2008). Once the defendant meets its burden, the burden shifts to the

16

nonmovant to raise a genuine issue of material fact precluding summary judgment on the affirmative defense. *See Centeq Realty, Inc. v. Siegler*, 899 S.W.2d 195, 197 (Tex. 1995).

## B. Applicable Law

### 1. Breach of Fiduciary Duty

Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages. *First United Pentecostal Church,* 514 S.W.3d at 220. The law does not recognize a fiduciary relationship lightly. *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Whether such a duty exists depends on the circumstances. *Id.*

Corporate officers and directors owe a fiduciary duty to the corporation that they serve. *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963); *Grinnell v. Munson*, 137 S.W.3d 706, 718 (Tex. App.—San Antonio 2004, no pet.). A corporate fiduciary is under an obligation not to usurp corporate opportunities for personal gain, and equity will hold him accountable to the corporation for his profits if he does so. *Int'l Bankers*, 368 S.W.3d at 577. The responsibility of the corporate fiduciary includes the dedication of his uncorrupted business judgment for the sole benefit of the corporation. *Id.*

As this court has noted before, it is without question that corporate officers and fiduciaries are "held 'in official action, to the extreme measure of candor,

17

unselfishness, and good faith.'" *Cardwell v. Wilson Trophy Co. of Fort Worth-Dallas, Inc.*, 622 S.W.2d 651, 653 (Tex. App.—Fort Worth 1981, writ ref'd n.r.e.) (citing *Int'l Bankers*, 368 S.W.2d at 577). The duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his personal interest to prevail over that of the corporation. *Loy v. Harter*, 128 S.W.3d 397, 407 (Tex. App.—Texarkana 2004, pet. denied).

Directors and officers of a corporation must make full disclosure of their personal interest in a transaction that they are negotiating for the corporation. *Gen. Dynamics v. Torres*, 915 S.W.2d 45, 49 (Tex. App.—El Paso 1995, writ denied). A transaction in which a corporate fiduciary derives personal profit is subject to the closest examination, and the form of the transaction will give way to the substance of what actually occurred. *Int'l Bankers*, 368 S.W.2d at 577.

### 2. Waiver and Ratification

Waiver is defined as "an intentional relinquishment of a known right or intentional conduct inconsistent with claiming that right." *Sun Expl. & Prod. Co. v. Benton*, 728 S.W.2d 35, 37 (Tex. 1987). The elements of waiver include: (1) an existing right, benefit, or advantage held by a party; (2) the party's actual knowledge of its existence; and (3) the party's actual intent to relinquish the right or intentional conduct inconsistent with the right. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). Being largely a matter of intent, waiver is ordinarily a question of fact, but when the surrounding facts and circumstances are undisputed, the

question becomes one of law. *Motor Vehicle Bd. of Tex. Dep't of Transp. v. El Paso Indep. Auto. Dealers Ass'n, Inc.*, 1 S.W.3d 108, 111 (Tex. 1999).

Ratification occurs when a person who knows all the material facts confirms or adopts a prior act that did not legally bind him and which he could have repudiated. *Samms v. Autumn Run Cmty. Improvement Ass'n, Inc.*, 23 S.W.3d 398, 403 (Tex. App.—Houston [1st Dist.] 2000, pet. denied) (citing *K.B. v. N.B.*, 811 S.W.2d 634, 638 (Tex. App.—San Antonio 1991, writ denied)). The elements of the affirmative defense of ratification are: (1) approval by act, word, or conduct; (2) with full knowledge of the facts of the earlier act; and (3) with the intention of giving validity to the earlier act. *Id.* (citing *Motel Enters. Inc. v. Nobani*, 784 S.W.2d 545, 547 (Tex. App.—Houston [1st Dist.] 1990, no writ)).

It is the general rule in Texas that transactions between corporate fiduciaries and their corporation are capable of ratification by the shareholders or the board of directors' specific approval or acquiescence, laches, or acceptance of benefit. *Wiberg v. Gulf Coast Land & Dev. Co.*, 360 S.W.2d 563, 567 (Tex. Civ. App.—Beaumont 1962, writ ref'd n.r.e.); *Pruitt v. Westbrook*, 11 S.W.2d 562, 565 (Tex. Civ. App.—Fort Worth 1928, no writ). However, ratification by any means is effective only when the officer has fully disclosed all of the material facts of the transactions to the board of directors or shareholders. *See Vessels v. Anschutz Corp.*, 823 S.W.2d 762, 764 (Tex. App.—Texarkana 1992, writ denied).

## C. Application of Law to Facts

On appeal, RPP contends generally that the trial court erred in granting Tate and Cuffia's traditional and no-evidence motion for summary judgment because the summary judgment evidence created a genuine issue of material fact on its claims for breach of a fiduciary duty. Tate and Cuffia maintain that summary judgment was proper because (1) "a fiduciary[9] cannot be held liable for failing to disclose information that is known by the other party"; (2) RPP either waived or ratified the bonuses after discovering all material facts, closing on the sale, and accepting benefits therefrom; (3) there is no admissible evidence that the bonus agreements "drove down the price" of RPP; and (4) there is either no evidence that Tate intentionally downloaded a virus on RPP's computer or the only evidence conclusively establishes that the virus was the result of a ransomware demand by an unknown third party.

---

[9]Tate and Cuffia have not disputed the existence of a fiduciary duty. However, in his deposition, Tate equivocated on the extent of that duty:

> Q:    Do you have an obligation to - - to not work against the interests of your company?
>
> A:    In total, no.
>
> . . . .
>
> Q:    So you believe you have certain ethical obligations to your company?
>
> A:    I have an ethical obligation to myself and the people.

In support of their motion, Tate and Cuffia relied on the following summary judgment evidence: the declaration of Hansen; excerpts of deposition testimony of Hansen, Bettegowda, Baudhuin, Nathan Barber, and Ballinger; emails dated January 18, 19, and 21, 2018, and February 16, 2018; text message dated January 24, 2018; letter of intent between RPP and Pregis dated January 29, 2018; interrogatory answers of Hansen and Ballinger in the Michigan litigation; retention bonus agreements; and affidavit of Tate and Cuffia's attorney, William L. Kirkman. In response, RPP relied upon a 472-page appendix containing forty-six exhibits, including deposition excerpts, text messages, emails, Hansen's declaration, the asset purchase agreement between RPP and Pregis, and the retention bonus agreements between Pregis and Tate and Cuffia.

### 1. Duty of Disclosure

Tate and Cuffia start their argument with the contention that they "cannot be held liable for failing to disclose information that RPP already knew." *See Lundy,* 260 S.W.3d at 501 ("Lundy cannot be held liable for failing to disclose a fact the company knew through one of its officers."); *Pfeiffer v. Ebby Halliday Real Estate, Inc.,* 747 S.W.2d 887, 890 (Tex. App.—Dallas 1988, no writ) ("[W]e fail to see how Ebby Halliday can be charged with a 'failure to disclose information' which the Pfeiffers already knew."). We disagree for two reasons.

First, RPP did not have full knowledge of all information about the retention bonus agreements until after this lawsuit was filed. Considering the evidence in the

light most favorable to RPP, whatever information RPP knew was learned only after the conduct by Tate and Cuffia had occurred and before the retention bonus agreements had been finalized. It is undisputed that RPP first learned of the "super bonus" when examining emails on January 24, 2018. The agreements were not signed and effective until February 23, 2018. In his declaration, Hansen asserted that he did not see an executed copy of a retention bonus agreement until after filing this suit:

> I didn't have the full picture of Tate's breaches of his duties to RPP until after discovery in this matter fully revealed his conduct. [RPP] only had a suspicion. Neither I nor any other equity owner of RPP ever had actual, certain, knowledge that Tate and Cuffia were receiving a super bonus until after this lawsuit was filed.

And, even assuming that RPP had some knowledge of the retention bonus agreements before it signed the asset purchase agreement, such knowledge does not bar a claim for breach of fiduciary duty. An after-the-fact disclosure of the facts that form the basis of a breach-of-fiduciary duty claim does not restore the parties to a position as if there had been no breach. *McCullough v. Scarbrough, Medlin & Assocs., Inc.*, 435 S.W.3d 871, 903 (Tex. App.—Dallas 2014, pet. denied).

Second, even if there was knowledge regarding some facts of the failure to disclose claim, the failure to disclose is not the only breach of fiduciary duty that RPP asserted in its pleadings. In its third amended petition, RPP's allegations under the heading "breach of common law fiduciary duty against defendants James Donald Tate and Michael Cuffia" included the following:

22

Tate and Cuffia owed a duty not to usurp corporate opportunities for personal gain; a duty of utmost good faith in the officer[s'] relations with the corporation; a duty of full disclosure of any personal interest the officer or director has in the subject matter of a contract the officer or director negotiates with the corporation; a duty of loyalty; and a duty to use uncorrupted business judgment for the corporation.

. . . .

Tate and Cuffia are currently working on behalf of a competing company without disclosure or approval and used their position and deception to give a competitor an advantage.

. . . .

Tate and Cuffia are further liable for self-dealing through negotiating a side-deal for themselves to the detriment of RPP. Defendants Tate and Cuffia failed to use uncorrupted business judgment to act in the best interest of RPP.

. . . .

Instead of acting as a proper fiduciary to RPP, Defendants Tate and Cuffia engaged in a conspiracy with competitors of their company, and negotiated a secret deal for payment of $1.5 million in exchange for driving down the price of the assets of their own employer by $3 [m]illion.

Tate and Cuffia did not move for summary judgment on all of the alleged breaches of their fiduciary duty. Rather, their motion concentrated on the "failure to disclose" allegations.

It is fundamental that a motion for summary judgment must stand or fall on the grounds it specifically and expressly sets forth. *McConnell v. Southside Indep. Sch. Dist.*, 858 S.W.2d 337, 339 (Tex. 1993). As a general rule, granting a summary

23

judgment on a claim not addressed in the summary judgment motion is reversible error. *G & H Towing Co. v. Magee*, 347 S.W.3d 293, 297 (Tex. 2011).

After applying these rules to the summary judgment motion in this case, it is clear that the part of Tate and Cuffia's motion that is based on the failure to disclose claims did not address the myriad of other alleged breaches of fiduciary duty. And as regards these other alleged breaches, RPP's knowledge of the "super bonus" is not dispositive. In addition, considering the evidence in the light most favorable to RPP, RPP did not know that the retention bonus agreements were executed until after it closed on the asset purchase agreement and after litigation commenced. For all of these reasons, summary judgment cannot be affirmed on this ground.

### 2. Waiver and Ratification

By relying on their affirmative defenses of waiver and ratification, Tate and Cuffia had the burden of establishing all the elements of each defense. *In re State Farm Lloyds, Inc.*, 170 S.W.3d 629, 634 (Tex. App.—El Paso 2005, orig. proceeding); *Centeq Realty, Inc.*, 899 S.W.2d at 197. Central to the inquiries concerning both affirmative defenses is the question whether RPP had "full knowledge" of the facts surrounding the transaction. *See Spangler v. Jones*, 797 S.W.2d 125, 131 (Tex. App.—Dallas 1990, writ denied). Secondary to this inquiry is whether Tate's and Cuffia's signing the retention agreements acted as a waiver or ratification of the breach.

Because waiver is largely a matter of intent, intent must be shown by the surrounding facts and circumstances of RPP's behavior. *Van Indep. Sch. Dist. v.*

24

*McCarty*, 165 S.W.3d 351, 353 (Tex. 2005). The burden was on Tate and Cuffia to prove knowledge of the breach and to prove a voluntary, intentional choice to ratify the contract despite that knowledge. *Spangler*, 797 S.W.2d at 131. RPP's conduct must be "unequivocally inconsistent" with claiming its rights. *Shields Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 485 (Tex. 2017) (citing *Van Indep. Sch. Dist.*, 165 S.W.3d at 353).

With regard to the first inquiry—whether there was full knowledge—Hansen stated that he did not learn about the "super bonus" until around January 24, 2018, when he and two others conducted a review of Tate's emails. RPP contends that it was possible that Tate, Cuffia, or Pregis would have a "change of heart" prior to the closing and back out of the retention bonus agreement. Even as late as the date of closing on February 23, 2018, Hansen was only aware that a super bonus "may be paid or may not be paid."

With regard to the second inquiry, Tate and Cuffia confuse the signing of the asset sale agreement with the signing of the retention bonus agreement. Unlike the asset sale agreement, the agreements which set out the "super bonus" were not signed by either Hansen or anybody else on behalf of RPP. Rather, they were between Pregis and Tate and Cuffia, and they were circulated between them on February 22, 2018, and signed by them on February 23, 2018.

As is evident from the emails, the retention and asset sale agreements were, as described by RPP, "two parallel transactions separate and apart from one another."

Even Bettegowda, when deposed, testified that there were "two separate components" of the purchase price—the asset purchase agreement and the retention bonus agreements—and he "tried to negotiate them separately." Similarly, in his deposition, Tate testified that the "super bonus was a separate deal. It was not part of the sale." Pregis, not RPP, had the obligation to pay the retention bonus agreements. Going forward with the asset purchase agreement did not preclude RPP from recovering on their breach of fiduciary duty claim. *See Fortune Prod. Co. v. Conoco, Inc.*, 52 S.W.3d 671, 680 (Tex. 2000) ("Fortune and Tucker are not precluded from recovering fraud damages simply because they continued to perform contracts that were binding for a stated term after they learned of the fraud that induced those contracts.").

The burden was on Tate and Cuffia to prove an actual intent to relinquish or a voluntary, intentional choice to ratify the "super bonus." If the acts of ratification are controverted, the question is one of fact. *Id.* Tate and Cuffia presented no summary judgment evidence of any positive act, representation, or affirmative deed showing RPP intentionally waived its right to seek damages against them for breach of fiduciary duty. *See generally Sun Expl. & Prod. Co.*, 728 S.W.2d at 37. In fact, the evidence shows the contrary. Despite numerous requests by Tate, RPP refused to sign a release. Proceeding with the asset sale closing is no evidence of conduct "unequivocally inconsistent" with RPP's rights to seek damages for breach of fiduciary duty. *Van Indep. Sch. Dist.*, 165 S.W.3d at 353.

26

Ratification can be effectual between the parties only when the agent's tortious act is openly and admittedly on behalf of the principal. *Spangler v. Jones*, 861 S.W.2d 392, 396 (Tex. App.—Dallas 1993, writ denied) (citing *Herider Farms-El Paso, Inc. v. Criswell*, 519 S.W.2d 473, 477 (Tex. Civ. App.—El Paso 1975, writ ref'd n.r.e.)). When the agent's tortious act is for the benefit of the agent or some third party, then the principal does not ratify the acts of the agent by accepting the agreement purportedly entered into on its behalf by the agent. *Herider Farms-El Paso, Inc.*, 519 S.W.2d at 477–78. Here, the retention bonus agreements were solely for the benefit of Tate, Cuffia, and two others. RPP neither agreed to nor accepted these agreements. In addition, only Pregis was responsible for paying the bonuses. Therefore, signing of the agreements by Tate, Cuffia, and Pregis cannot act as a waiver or ratification of RPP's rights.

Tate and Cuffia cite to a number of cases in which they say that "Texas courts have not hesitated to find waiver and ratification as a matter of law." *See Tenneco Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *Agarwal v. Villavaso*, No. 03-16-00800-CV, 2017 WL 3044545, at *5 (Tex. App.—Austin July 13, 2017, no pet.) (mem. op.); *B & R Dev., Inc. v. Rogers*, 561 S.W.2d 639, 643 (Tex. Civ. App.—Texarkana 1978, writ ref'd n.r.e.); *Trinh v. Lang Van Bui*, No. 14-11-00442-CV, 2012 WL 5378112, at *7 (Tex. App.—Houston [14th Dist.] Nov. 1, 2012, pet. denied) (mem. op.); *Meyer Farms, Inc. v. Texaco Producing, Inc.*, No. 07-01-0344-CV, 2002 WL 31261163, at *2–4 (Tex. App.—Amarillo Oct. 2, 2002, pet. denied) (not designated for publication); *see also*

27

*R & L Inv. Prop., L.L.C. v. Hamm*, 715 F.3d 145, 146–49 (5th Cir. 2013). However, none of these cases involve two separate agreements involving different parties and thus do not apply to this case.

We conclude that the defenses of waiver and ratification relied upon by Tate and Cuffia have not been established as a matter of law so as to entitle them to summary judgment on the claims for breach of fiduciary duty. Therefore, we sustain that portion of RPP's first issue.

### 3. Damages

Tate and Cuffia also moved for traditional and no-evidence summary judgment on the damages portion of RPP's claim for breach of fiduciary duty. In their no-evidence portion of the motion for summary judgment, Tate and Cuffia contend that there is no evidence that (1) Pregis ever agreed to pay RPP $20 million for its assets, (2) Pregis ever agreed to pay RPP anything more than $17 million for its assets, or (3) the retention bonuses had any effect whatsoever on the $17 million purchase price paid by Pregis to RPP for its assets. For the traditional part of their motion, Tate and Cuffia contend that the claims are barred by their affirmative defenses of ratification and waiver, both of which we have previously addressed. RPP argues that there is "ample proof that Tate and Cuffia's side deal reduced [the] price," and it is also entitled to equitable relief in the form of profit disgorgement or fee forfeiture, both of which do not require proof of damages. We agree with RPP.

Generally, to recover for breach of fiduciary duty, the evidence must prove "the existence of a fiduciary duty, breach of the duty, causation, and damages." *Abetter Trucking Co. v. Arizpe*, 113 S.W.3d 503, 508 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, a party seeking forfeiture and equitable disgorgement need not prove damages as a result of the breach of fiduciary duty. *Ramin' Corp. v. Wills*, No. 09-14-00168-CV, 2015 WL 6121602, at *9 (Tex. App.—Beaumont Oct. 15, 2015, no pet.) (mem. op.) (citing *Burrow v. Arce*, 997 S.W.2d 229, 240 (Tex. 1999)). To remedy a breach of fiduciary duty, courts may fashion equitable remedies such as profit disgorgement and fee forfeiture. *ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 873 (Tex. 2010). As explained by the Texas Supreme Court:

> A fiduciary cannot say to the one to whom he bears such relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you, and therefore you are without remedy. It would be a dangerous precedent for us to say that unless some affirmative loss can be shown, the person who has violated his fiduciary relationship with another may hold on to any secret gain or benefit he may have thereby acquired.

*Johnson v. Brewer & Pritchard, P.C.*, 73 S.W.3d 193, 200 (Tex. 2002) (citing *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 514 (Tex. 1942)). Courts may disgorge all ill-gotten profits from a fiduciary when a fiduciary agent usurps an opportunity properly belonging to a principal or competes with a principal. *ERI Consulting Engineers, Inc.*, 318 S.W.3d at 873. Even if a fiduciary does not obtain a benefit from a third party by violating his duty, a fiduciary may be required to forfeit the right to compensation for the fiduciary's work. *Id.* "The main purpose of forfeiture is not to

29

compensate an injured principal, even though it may have that effect. Rather, the central purpose . . . is to protect relationships of trust by discouraging agents' disloyalty." *Burrow*, 997 S.W.2d at 238.

In its third amended petition, RPP pled for profit disgorgement or fee forfeiture due to Tate's and Cuffia's "many breaches of their fiduciary duties." By relying on these equitable theories, RPP was not required to show actual damages.

However, even where it sought actual damages for breach of fiduciary duty, RPP presented more than a scintilla of evidence showing that it had been damaged. In response to the no-evidence portion of Tate and Cuffia's motion, RPP pointed to various emails to show that the price offered for RPP decreased from at least $18 million to $17 million.[10] In his January 19, 2018 email to Bettegowda, Tate stated, "Rex has been adamant a[b]ou[t] getting $20 million for his business, but us equity owners have persuaded him to consider $18 and then we put a bit more pressure on him for the $17 with knowledge that there would be employment bonuses for those staying with the sale." Bettegowda, in his January 22, 2018 email to Baudhuin stated

---

[10]In a footnote in its response to the motion for summary judgment, "RPP concedes that there may be a genuine issue of material fact regarding the exact **extent** of the damage caused by Pregis's fraud, but there is no genuine dispute regarding the **existence** of RPP's damages." RPP goes on to state that "the evidence is not conclusive whether the price was depressed from $20 million, $18.5 million, or even $18 million. The evidence, however, is conclusive that the price was depressed from at least $18 million to $17 million."

that "[t]he price was 18 and change and [Tate] suggested moving it to 17 and using a million to pay the team and keep them on board."

Even the charts in the January 23, 2018 email from Tate to Bettegowda appear to show an analysis of a purchase price of both $17 and $18.5 million and the amount each equity owner would receive under the two scenarios. According to the charts, the cash proceeds payable to Williamette decrease by $946,800 if the purchase price decreases from $18.5 to $17 million while the payments to Tate and Cuffia substantially increase when the "super bonus" is added to their equity shares.

The emails offer more than a scintilla of evidence that RPP sustained damages based on the retention bonus agreements.[11] In addition to actual damages, as noted above, RPP sought fee forfeiture and profit disgorgement. Fee forfeiture and disgorgement were not the subject of Tate and Cuffia's motion for summary judgment. *See Padua v. Jason A. Gibson, P.C.*, 608 S.W.3d 842, 845 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (holding that because disgorgement and imposition of a constructive trust were not the subject of a ground in the motion for summary judgment, the order did not dispose of them); *see also First United Pentecostal Church*, 514 S.W.3d at 221 (holding that to defeat "a no-evidence motion for summary

---

[11]RPP makes an additional argument, which we do not need to address here, that it had a duty to mitigate its damages by closing on the asset purchase transaction. *See E.L. & Assocs., Inc. v. Pabon*, 525 S.W.3d 764, 772 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (holding that a mitigation of damages instruction was warranted on a corporation's claims that two former directors breached their fiduciary duty and that the son assisted in breach of fiduciary duty).

judgment as to a claim for actual damages, the church must have provided evidence that Parker's actions were causally related to the loss of its money. . . . [T]he church was not required to show causation and actual damages as to any equitable remedies it sought."). For these reasons, summary judgment for Tate and Cuffia on the ground that RPP did not suffer damages was improper, and we accordingly sustain this part of RPP's issue.

### 4. Virus

Tate also moved for traditional and no-evidence summary judgment on the claim against him for breach of common law fiduciary duty for downloading a virus on RPP's computer. In support of his traditional motion, Tate attached portions of the deposition testimony of Barber, whom Hansen describes as RPP's "IT guy." After being told that Tate's computer had been infected with a virus, Barber inspected the computer and did an analysis to see what was wrong. Barber concluded that the virus got onto Tate's computer by ransomware.

For the no-evidence portion of his motion, Tate contended that there was no competent summary judgment evidence that he "knowingly downloaded a virus on RPP's computer in an effort to destroy electronic information stored therein." In its one-paragraph summary judgment response, RPP pointed generally to the "chain of events" that it contends "creates a genuine issue of material fact regarding the actions of Tate and calls into question whether he intentionally attempted to destroy evidence

by taking steps to ensure a virus was infected on his computer." However, RPP attached no summary judgment evidence in support of its contentions.[12]

When a party moves for summary judgment under both Rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of Rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). Once a motion under Rule 166a(i) is filed, the burden shifts to the nonmoving party to present evidence raising an issue of material fact as to the elements specified in the motion. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006). As stated above, RPP failed to attach any summary judgment evidence in response to this part of Tate's motion for summary judgment. Because on this record there is a complete absence of evidence of a vital fact—that Tate infected his computer with a virus—we sustain the no-evidence point as to this cause of action. *See King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (citing *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex. 1997)) ("A no evidence point will be sustained when (a) there is a complete absence of evidence of a vital fact, (b) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (c) the evidence offered to prove a vital fact is no more than a mere scintilla, or (d) the evidence conclusively establishes the opposite of the vital fact."). Therefore, we

---

[12]In its brief, RPP admits that "Appellants['] argument regarding Tate's destruction of RPP Property was more for the purpose of seeking a spoliation instruction at trial." We do not address the spoliation issue here.

overrule that part of RPP's issue complaining of the summary judgment that was granted on the cause of action against Tate for breach of his common law fiduciary duty by downloading a virus onto RPP's computer.

## IV. CONCLUSION

We affirm the part of the trial court's judgment granting summary judgment on the claim against Tate for breach of common law fiduciary duty for downloading a virus on RPP's computer. We reverse the remainder of the trial court's judgment granting Tate and Cuffia's motion for summary judgment and remand those matters for trial.

/s/ Dana Womack

Dana Womack
Justice

Delivered: December 31, 2020